IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LESLIE HILL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 06-1309 |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I. Introduction

Plaintiff, Leslie Hill, seeks judicial review of a decision

of Defendant, Commissioner of Social Security ("Commissioner"),

denying her applications for disability insurance benefits

("DIB") and supplemental security income ("SSI") under Titles II

and XVI, respectively, of the Social Security Act, 42 U.S.C.

§§ 401-433 and §§ 1381-1383f.[1]  Presently before the Court are the

parties' cross-motions for summary judgment pursuant to

Fed.R.Civ.P. 56.  For the reasons set forth below, Plaintiff's

---

[1] The Social Security program provides two types of benefits
based on an individual's inability to engage in substantial
gainful activity.  The first type of benefits, DIB, provides
benefits to disabled individuals who have paid into the Social
Security system through past employment.  The second type of
benefits, SSI, provides benefits to disabled individuals who meet
low-income requirements regardless of whether the individuals
have ever worked and paid into the Social Security program.  *See,*
*e.g.*, Belcher v. Apfel, 56 F.Supp.2d 662 (S.D.W.V.1999).  Based
on her earnings record, Plaintiff meets the insured status
requirements of the Social Security Act for purposes of DIB
through December 2009.  (R. 17).

1

motion for summary judgment seeking a remand of this case for further proceedings will be granted, and the Commissioner's cross-motion for summary judgment will be denied.

## II. Background

### A. Procedural History

Plaintiff protectively filed applications for DIB and SSI on September 21, 2004, alleging disability since March 30, 2004 due to asthma, allergies and full body eczema.[2] (R. 52-54, 68, 172-74). Following the denial of Plaintiff's applications for DIB and SSI, she requested a hearing before an Administrative Law Judge ("ALJ"). (R. 30-33, 37, 177-80). At the hearing, which was held by ALJ John J. Porter on January 5, 2006, Plaintiff, who was represented by counsel, Plaintiff's mother and sister, and a vocational expert ("VE") testified. (R. 187-244).

The ALJ issued a decision on March 20, 2006, denying Plaintiff's applications for DIB and SSI based on his conclusion that Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work existing in significant numbers in the

---

[2]Asthma is an inflammatory disorder of the airways, which causes attacks of wheezing, shortness of breath, chest tightness and coughing. An allergy is an exaggerated immune response or reaction to substances that are generally not harmful. Eczema is a chronic skin disorder that involves scaly and itchy rashes. Eczema is also called atopic dermatitis. *See* www.nlm.nih.gov/ medlineplus/encyclopedia (last visited 12/12/2007).

national economy.[3]  (R. 17-23).  On April 20, 2006, Plaintiff
requested review of the ALJ's decision.  (R. 11-13).  However,
the request was denied by the Appeals Council on July 25, 2006.
(R. 7-9).  As a result, the ALJ's decision became the final
decision of the Commissioner.  This appeal followed.

## B. Factual Background

Plaintiff was born on January 28, 1975.[4]  With respect to
education, Plaintiff graduated from high school and attended
college for two years.  (R. 192).  Plaintiff, who is single,
resides with her mother.  (R. 192, 197-98).  At the time of the
hearing before the ALJ, Plaintiff weighed 260 pounds which she
attributed to taking steroids on a regular basis to control her
medical conditions.  (R. 204).  In the past, Plaintiff has worked
as a cashier in a grocery store (October 1997 to January 2000), a
baker in a bakery shop (May 2000 to April 2003), a cashier in a
department store (September 2003 to March 2004) and a

---

[3]The Social Security Regulations define RFC as the most a
claimant can still do despite his or her limitations.  20 C.F.R.
§ 404.1545.  With respect to the ALJ's RFC assessment in the
present case, sedentary work involves lifting no more than 10
pounds at a time and occasionally lifting or carrying articles
like docket files, ledgers, and small tools.  Although a
sedentary job is defined as one which involves sitting, a certain
amount of walking and standing is often necessary in carrying out
job duties.  Jobs are sedentary if walking and standing are
required occasionally and other sedentary criteria are met.  20
C.F.R. § 404.1567(a).

[4]At the time of the hearing before the ALJ, Plaintiff was 30
years old.

3

telemarketer (August 2004 to September 2004).[5]  (R. 75, 82).

Numerous things exacerbate Plaintiff's allergies and eczema, including heat, stress, dust, latex, wool, feathers, pollen, flowers, live Christmas trees and sitting next to a person who owns a cat or dog or wears perfume.  In addition, Plaintiff has numerous food allergies.  Plaintiff's bedroom is equipped with an air conditioner that contains a HEPA filter, and she uses the air conditioner year round.  (R. 196-97, 209).  Plaintiff testified that there has never been a day in her life when she has not had sores on her body from eczema.  At times, Plaintiff has difficulty walking due to sores on her legs, buttocks and private areas.  (R. 200).  Plaintiff also suffers from a constant fungus infection on her feet and a scalp condition.  (R. 207).  Plaintiff uses an inhaler at least three times a day due to asthma.  (R. 209).

---

[5]Plaintiff has not worked since 2004, when she was employed for 3 weeks as a telemarketer.  Plaintiff testified that she had to quit the telemarketer job because the earpiece required to perform the job irritated her eczema and caused her ears to bleed.  Plaintiff also testified that she attempted to work as a cashier in a convenience store; however, she had to leave this job after 3 months because the lack of adequate air conditioning and the cleaning chemicals to which she was exposed in the job irritated the eczema on her hands, legs and neck.  (R. 193-95).  As to her relatively lengthy employment in the bakery shop, Plaintiff testified that the shop was privately owned; that she would call off whenever the sores on her hands got bad; and that the owner "finally got sick of it."  (R. 203).  In fact, Plaintiff testified that she quit or was fired from most of the jobs she has ever held due to excessive absenteeism resulting from her medical conditions.  (R. 202).

4

Plaintiff is able to dine out, go to movie theaters, shop at the mall and attend church; however, she has had to terminate these activities on occasion due to exacerbation of her medical conditions.[6] (R. 198, 212). At the time of the hearing before the ALJ, Plaintiff continued to smoke cigarettes despite her medical conditions. (R. 199). With regard to the manner in which Plaintiff's medical conditions limit her ability to work, she testified as follows:

\* \* \*

A. People don't like it. I'll just be very honest with you. People don't like it. As you can see, I'm over here scratching because I'm very nervous and that's a part of it, the nerves are. But when I worked at Target and I worked at CoGo's, I worked anywhere that I've worked, when people would see the sores on my head or on my face or on my hands or if I had a T-shirt on and they saw my arms - when I go grocery shopping, if they - if I have a pair of shorts on and they see them on my legs, they avoid me. I've actually had people, when I worked at Target, they actually told me, get another cashier, you're not touching my stuff. I don't know what kind of disease you have and that you could give me. You get another cashier. Little kids, Mommy, what's that? Why is she - why is her face red, Mommy? Why does she have sores on her legs like that? You know, it's been all - people just don't like it. They don't like to look at it. They don't like it when your face is peeling and you look like you have dandruff when actually you - it's just your sores are falling off of you. It's not a pretty disorder or disease.

\* \* \*

---

[6]As an example, Plaintiff testified that she went into a clothing store one day when the employees were unpacking new merchandise and the packaging had a "horrific smell." Plaintiff had to leave the store because she had an asthma attack, her allergies "started going wild," and her eyes started swelling shut. (R. 198).

5

(R. 199).

## C. Vocational Expert Testimony

At the hearing on Plaintiff's applications for DIB and SSI, the ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education and work experience who has the exertional ability to perform sedentary work, but who must avoid even moderate exposure to fumes, odors, dusts, gases, environments with poor ventilation, hot/cold temperature extremes, and extreme wetness and humidity. The ALJ then asked the VE whether the hypothetical individual would be able to perform Plaintiff's past relevant work as a baker or cashier or any other any jobs existing in the national economy. (R. 239). In response, the VE testified that the individual could not perform Plaintiff's past relevant work; however, the individual could perform the jobs of order clerk (400 jobs regionally, 260,000 jobs nationally), addresser/mail sorter (200 jobs regionally, 46,898 jobs nationally), table worker (490 jobs regionally, 89,992 jobs nationally) and information clerk (440 jobs regionally, 95,000 jobs nationally). (R. 239-40).

Next, the ALJ asked the VE to assume that the hypothetical individual also is limited to only occasional interaction with the public and whether this additional limitation would eliminate any of the jobs that the VE had previously testified the individual could perform. The VE testified that the additional

6

limitation would eliminate the job of information clerk, but that
the other three jobs would not be compromised. (R. 240).

Plaintiff's counsel then asked the VE to describe an
employer's tolerance for an employee being off task and for
employee absences. In response, the VE testified that full-time
competitive employment would be compromised if an employee missed
1 to 3 days a month or 10 to 15 days annually or if an employee
was off task 10% of the time on a regular basis. (R. 241).

## D. Medical Evidence[7]

On November 3, 2003, Plaintiff underwent a physical
examination by Dr. Conforti, her long-time primary care
physician, for employment purposes. Dr. Conforti described his
review of Plaintiff's systems, including her skin, as normal, and
his clinical impression of Plaintiff's conditions included
asthma, eczema and allergies. (R. 121). In his office notes of
Plaintiff's November 3rd visit, Dr. Conforti noted that Plaintiff
was bothered by allergies, asthma and eczema, and that although
Plaintiff's skin exhibited signs of eczema, she had no secondary
infections at that time. (R. 115).

On September 15, 2004, Plaintiff presented to the Emergency
Room ("ER") of Jeannette District Memorial Hospital with

_____

[7]The alleged onset date of disability in this case is March
30, 2004. As a result, the Court will limit its summary of the
evidence in the administrative file to the evidence pertaining to
Plaintiff's medical conditions since November 2003, several
months before the alleged onset date of Plaintiff's disability.

complaints of jaw pain and allergies.[8] Her diagnoses were
exacerbation of eczema and TMJ pain syndrome.[9] Prednisone and
Vicodin were prescribed for Plaintiff.[10] (R. 123-28).

Plaintiff saw Dr. Conforti on October 19, 2004, indicating
that she wanted to lose weight because obesity was interfering
with her activities of daily living. Dr. Conforti's office notes
indicate that Plaintiff was 5'4" tall and weighed 250 pounds, and
that her physical examination was unremarkable. (R. 171).
Plaintiff returned to Dr. Conforti for a follow-up visit on
November 9, 2004. Plaintiff had gained 4 pounds and reported
that she was bothered by her allergies and eczema. With the

---

[8]With respect to Plaintiff's complaint of jaw pain, the ER
records noted that Plaintiff developed this pain an hour or two
after singing a solo at her church. (R. 127).

[9]The temporomandibular joints (TMJs) connect your lower jaw
to your skull. There are two matching joints - one on each side
of your head, located just in front of your ears. The
abbreviation "TMJ" literally refers to the joint but is often
used to refer to any disorders or symptoms of this region. Such
problems include popping sounds in the jaw, inability to fully
open the mouth, jaw pain, headaches, earaches, toothaches and
various other types of facial pain. See nlm.nih.gov/medlineplus/
encyclopedia (last visited 12/12/2007).

[10]Prednisone is used alone or with other medications to treat
the symptoms of low corticosteroid levels. Prednisone is also
used to treat other conditions in patients with normal
corticosteroid levels. These conditions include certain types of
arthritis, severe allergic reactions, multiple sclerosis, lupus,
and certain conditions that affect the lungs, skin, eyes,
kidneys, blood, thyroid, stomach and intestines. Vicodin is a
combination of acetaminophen and hydrocodone that is used to
relieve moderate to moderately severe pain. See www.nlm.nih.gov/
medlineplus/druginfo (last visited 12/12/2007).

8

exception of a mild eczema rash, Dr. Conforti indicated that
Plaintiff's physical examination was unchanged from the prior
visit. Plaintiff was instructed to continue to use her inhalers
and, if needed, he would prescribe Kenalog for her.[11] In the
meantime, Plaintiff was instructed to try exercise and dietary
modification to lose weight. (R. 171).

On December 10, 2004, Dr. Emilio Villegas performed a
consultative examination of Plaintiff at the request of the
Pennsylvania Bureau of Disability Determination. Plaintiff
reported that she had suffered from asthma since the age of 12
and from eczema since early childhood; that the eczema causes
hives all over her body; that she has been seen by many
dermatologists for her skin condition; and that the only
medication that is prescribed to control her skin condition is
steroids.[12] Plaintiff also reported that she had smoked a half
pack of cigarettes a day until September 2004, when she quit.
Dr. Villegas noted that Plaintiff's physical examination revealed
(a) crusting lesions on both external ear canals, (b) large hives

---

[11]Kenalog is used to treat the itching, redness, dryness,
crusting, scaling, inflammation and discomfort of various skin
conditions. *See* www.nlm.nih.gov/medlineplus/druginfo (last
visited 12/12/2007).

[12]With respect to the effect of her medical conditions on
past employment, Plaintiff told Dr. Villegas that she quit the
cashier job because customers would panic and complain when she
had an asthma attack, and that customers also complained because
her skin would bleed and stain her clothes and the customers were
afraid that she had a contagious disease. (R. 129).

9

over almost her entire face with dry, thick, scaly skin and oozing sores; and (c) obesity around the neck.[13]  Dr. Villegas's impression was severe eczema, history of bronchial asthma and morbid obesity.  (R. 129-31).  With respect to Plaintiff's ability to perform work-related physical activities, Dr. Villegas indicated that Plaintiff could occasionally lift and carry 25 pounds; that Plaintiff had no limitation in her ability to walk and stand; that Plaintiff could sit for 6 hours of an 8-hour workday; that Plaintiff's ability to push and pull with her upper and lower extremities was unlimited; that Plaintiff had no postural limitations; and that Plaintiff should avoid areas with poor ventilation, temperature extremes, chemicals, wetness, dust, fumes, odors, gases and humidity.  (R. 132-33).

On December 16, 2004, Plaintiff saw Dr. Conforti for a check-up on her eczema, which the doctor described as "on a day to day basis."  Plaintiff's physical examination was unremarkable and, because she had not lost any weight, Dr. Conforti prescribed Ionamin for her.[14]  (R.170).

On April 1, 2005, Plaintiff returned to Dr. Conforti for a check-up.  Plaintiff indicated that asthma was curtailing her

---

[13]With respect to obesity, Dr. Villegas noted that Plaintiff's height was 5'4" and she weighed 256 pounds.  (R. 130).

[14]Ionamin is used, in combination with diet and exercise, to help you lose weight.  It works by decreasing your appetite.  *See* www.nlm.nih.gov/medlineplus/druginfo (last visited 12/12/2007).

10

lifestyle and that it was difficult to control her eczema. Plaintiff was instructed to continue with her present therapy. (R. 170). On the same day, Dr. Conforti completed an Employability Assessment Form for the Pennsylvania Department of Public Welfare on Plaintiff's behalf, indicating that she was permanently disabled due to asthma and eczema. (R. 137).

On April 13, 2005, Plaintiff presented to the ER of Jeannette District Memorial Hospital with a complaint of allergic reaction. Plaintiff's symptoms included, a swollen left eye, throat swelling, a cough and a stuffy nose of 7 to 10 days' duration with no improvement. The diagnosis was exacerbation of asthma. Plaintiff was instructed to stop smoking and to ask Dr. Conforti if inhaled steroids would help her asthma. (R. 148-57).

Plaintiff saw Dr. Conforti for a post-ER follow-up visit on April 21, 2005. Dr. Conforti noted that Plaintiff's eczema was cleared and that Plaintiff was doing very well, although she continued to be bothered by allergies and chronic pain. Nevertheless, Plaintiff was doing better overall.[15] Plaintiff was instructed to continue with her present therapy. (R. 169).

Plaintiff's next visit with Dr. Conforti took place on August 15, 2005. Plaintiff complained of a mild flare-up of her allergies and a hip injury as the result of a fall. Dr. Conforti

---

[15]The office notes of this visit indicate that Plaintiff refused to be weighed. (R. 169).

11

noted that Plaintiff was suffering from mild shortness of breath, as well as exacerbation of her eczema and allergies and "pain all over."[16] Plaintiff's physical examination showed some slight rhonchi bilaterally, but no infection. Plaintiff was instructed to continue using a topical steroid for her eczema rash and to increase her inhaler use, and Dr. Conforti gave Plaintiff a dose of Prednisone. (R. 169).

On December 15, 2005, Dr. Alicia Baum completed a report concerning her treatment of Plaintiff. Dr. Baum noted that she initially saw Plaintiff on December 6, 2005; that Plaintiff had a follow-up visit scheduled for December 23, 2005; that Plaintiff suffers from eczema, asthma, hay fever and hives; that Plaintiff has been treated for eczema since she was a baby; that Plaintiff has developed a cushionoid condition from the long term use of steroids;[17] that she referred Plaintiff to an endocrinologist;

---

[16]Again, Plaintiff refused to be weighed. However, Dr. Conforti noted that her weight was greater than 250 pounds. (R. 169).

[17]Cushing syndrome is a disease that occurs when your body produces too much of the hormone cortisol. It may also occur if you take too much cortisol or other steroid hormones. Symptoms include (a) a round, red and full face, (b) a collection of fat between the shoulders, (c) central obesity with protruding abdomen and thin extremities, (d) unintentional weight gain, (e) weakness, (f) backache, (g) headache, (h) acne or superficial skin infections, (i) thin skin with easy bruising, (j) mental changes and (k) facial hair growth. *See* www.nlm.nih.gov/ medlineplus/encyclopedia (last visited 12/12/2007). With respect to her cushionoid condition, Plaintiff testified that in addition to weight gain, she suffers from thin skin which bruises easily and severe mood swings during which she is agitated and angry.

12

that Plaintiff will require future care to maintain her skin condition or it will worsen; and that Plaintiff could "possibly" engage in employment on a sustained basis depending on the type of work, but that a generalization concerning Plaintiff's ability to work was difficult because there is no cure for her skin condition. (R. 140-42).

On January 24, 2006, Dr. Conforti completed a form regarding his treatment of Plaintiff. According to the form, Plaintiff was initially seen by Dr. Conforti on June 18, 1991, and she was last seen on January 10, 2006. Dr. Conforti noted that Plaintiff is 5'4" tall and weighs in excess of 250 pounds. Dr. Conforti indicated that Plaintiff's diagnoses include eczema, asthma and allergies,[18] and that she suffers from painful skin rashes. (R. 163). Dr. Conforti also completed a range of motion chart for Plaintiff in which he indicated that Plaintiff has limitations in the range of motion of her shoulders, elbows, wrists, legs, and cervical and lumbar spines. (R. 164-65).

In a Physician's Report which also appears to have been completed by Dr. Conforti on January 24, 2006, the doctor indicated that Plaintiff has suffered from asthma, eczema and allergies since birth, resulting in rashes, wheezing and

_____

(R. 204-05, 212).

[18]Dr. Conforti lists a fourth diagnosis; however, the doctor's writing is illegible. (R. 163).

13

shortness of breath on exertion. With respect to treatment, Dr.
Conforti indicated that inhalers, steroids (oral, injectable and
topical) and antihistamines are prescribed to control Plaintiff's
conditions. Dr. Conforti described Plaintiff's progress as
"poor," noting that she has frequent exacerbations of eczema and
shortness of breath, and he described Plaintiff's prognosis as
"fair." Dr. Conforti opined that Plaintiff was permanently
disabled, noting that continual exacerbations of eczema with
painful rashes, open sores and restrictions in her range of
motion limit her employment opportunities. (R. 158-60).

In an Employability Re-Assessment Form completed by Dr.
Conforti on April 3, 2006, the doctor indicated that Plaintiff is
permanently disabled due to eczema and allergies and that his
opinion is based on physical examinations, medical records,
clinical history and appropriate tests and diagnostic procedures.
(R. 186).

### III. Jurisdiction and Standard of Review

The Court has jurisdiction of this appeal under 42 U.S.C.
§ 405(g) and § 1383(c)(3) (incorporating § 405(g)), which provide
that an individual may obtain judicial review of any final
decision of the Commissioner by bringing a civil action in the
district court of the United States for the judicial district in
which the individual resides. Based upon the pleadings and the
transcript of the record, the district court has the power to

14

enter a judgment affirming, modifying or reversing the
Commissioner's decision with or without a remand for a rehearing.

The Court's review of the Commissioner's decision is limited
to determining whether the decision is supported by substantial
evidence, which has been described as "such relevant evidence as
a reasonable mind might accept as adequate to support a
conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).
It consists of something more than a mere scintilla, but
something less than a preponderance. Dobrowolsky v. Califano,
606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have
decided the case differently, it must accord deference to the
Commissioner and affirm the findings and decision if supported by
substantial evidence. Monsour Medical Center v. Heckler, 806
F.2d 1185, 1190-91 (3d Cir.1986).

## IV. Legal Analysis

### A. The ALJ's Decision

In order to establish a disability under the Social Security
Act, a claimant must demonstrate an inability to engage in any
substantial gainful activity due to a medically determinable
physical or mental impairment which can be expected to result in
death or which has lasted or can be expected to last for a
continuous period of not less than 12 months. 42 U.S.C.
§ 423(d)(1). A Social Security claimant is considered unable to
engage in any substantial gainful activity only if her physical

15

or mental impairment or impairments are of such severity that she

is not only unable to do her previous work but cannot,

considering her age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the

national economy.   42 U.S.C. § 423(d)(2)(A).

In <u>Burnett v. Commissioner of Social Security Admin.</u>, 220

F.3d 112 (3d Cir.2000), the Third Circuit discussed the procedure

an ALJ must follow in evaluating a claim for Social Security

disability benefits, stating in relevant part:

*    *    *

In <u>Plummer</u>, we recounted the five step sequential
evaluation for determining whether a claimant is under a
disability, as set forth in 20 C.F.R. § 404.1520:

In step one, the Commissioner must determine
whether the claimant is currently engaging in
substantial gainful activity.   20 C.F.R. § 404.1520(a).
If a claimant is found to be engaged in substantial
gainful activity, the disability claim will be denied.
<u>Bowen v. Yuckert</u>, 482 U.S. 137, 140, 107 S.Ct. 2287,
2290-91, 96 L.Ed.2d 119 (1987).   In step two, the
Commissioner must determine whether the claimant is
suffering from a severe impairment.   20 C.F.R.
§ 404.1520(c).   If the claimant fails to show that her
impairments are "severe," she is ineligible for
disability benefits.

In step three, the Commissioner compares the
medical evidence of the claimant's impairment to a list
of impairments presumed severe enough to preclude any
gainful work.   20 C.F.R. § 404.1520(d).   If a claimant
does not suffer from a listed impairment or its
equivalent, the analysis proceeds to steps four and
five.   Step four requires the ALJ to consider whether
the claimant retains the residual functional capacity
to perform her past relevant work.   20 C.F.R.
§ 404.1520(d).   The claimant bears the burden of
demonstrating an inability to return to her past

16

relevant work. <u>Adorno v. Shalala</u>, 40 F.3d 43, 46 (3d Cir.1994).

> If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effects of all the claimant's impairments in determining whether she is capable of performing work and is not disabled.

<u>Plummer</u>, 186 F.3d at 428.

\* \* \*

220 F.3d at 118-19.

With respect to the ALJ's five-step sequential evaluation in the present case, steps one and two were resolved in Plaintiff's favor: that is, the ALJ found that Plaintiff had not engaged in substantial gainful activity at any time relevant to the decision, and that she suffers from a combination of severe impairments which include eczema, asthma and allergies. (R. 19). As to step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or equals the requirements of any listed impairment in 20 C.F.R., Pt. 404, Subpt. P, App. 1, and, in particular, Listing 3.00 relating to the respiratory system, Listing 8.00 relating to skin disorders and Listing 14.00 relating to the immune system. (R. 20).

17

Turning to step four, the ALJ found that Plaintiff was unable to perform any of her past relevant work due to her RFC.[19] (R. 22). Finally, at step five, based on the testimony of the VE, the ALJ found that considering Plaintiff's age, education, past work experience and RFC, there were a significant number of jobs at the sedentary exertional level in the national economy which Plaintiff could perform, including the jobs of order clerk, addresser/mail sorter and table worker.[20] (R. 23).

## B. Plaintiff's Argument

As noted previously, at step three of the sequential evaluation process, an ALJ must determine whether a claimant's impairment meets *or equals* a listed impairment. If so, the claimant is presumed to be disabled and the analysis ends. In the present case, the ALJ's step three determination regarding Plaintiff's eczema was limited to the following sentence: "The claimant's eczema has not resulted in signs or symptoms severe enough to meet the criteria outlined at Listing 8.01 et seq.

---

[19]As noted previously, the ALJ found that Plaintiff retained the RFC to occasionally lift and carry 10 pounds, frequently lift and carry lesser weights and stand and walk for one-third of an 8-hour workday. In addition, due to the occasional severity of her eczema, Plaintiff is limited to only occasional interaction with the general public. (R. 20).

[20]The ALJ also cited the job of information clerk at step five of the sequential evaluation. However, when asked to assume that the hypothetical individual was limited to only occasional interaction with the public, the VE testified that this additional limitation would eliminate the information clerk position. (R. 240).

18

pertaining to impairments of the skin." (R. 20).

Plaintiff raises two challenges to the ALJ's step three determination. First, Plaintiff asserts that the ALJ erred by failing to discuss, in more detail, the reason for his determination that she did not meet the requirements of Listing 8.05, which provides:

8.05 *Dermatitis* (for example, psoriasis, dyshidrosis, atopic dermatitis, exfoliative dermatitis, allergic contact dermatitis), with extensive skin lesions that persist for at least 3 months despite continuing treatment as prescribed.[21]

Second, Plaintiff asserts that even if the medical evidence does not support a finding that she meets the requirements of Listing 8.05, the ALJ erred by failing to consider whether the severity of her eczema is *equal to* the requirements of Listing 8.05. Based on Third Circuit case law, the Court cannot agree with Plaintiff's first argument. However, the Court does agrees with Plaintiff that the ALJ erred by failing to address the issue of whether the severity of her eczema is *equal to* the requirements of Listing 8.05, which necessitates a remand of this case.

Turning to Plaintiff's first argument, in Jones v. Barnhart, 364 F.3d 501 (3d Cir.2004), a Social Security claimant sought judicial review of a decision of the Commissioner denying her

---

[21]As noted previously, eczema is also called atopical dermatitis. Accordingly, Listing 8.05 is the appropriate listing for evaluating Plaintiff's eczema. "Extensive skin lesions" are defined in Section C1 of the introduction to Listing 8.00 as those involving "multiple body sites or critical body areas, and result[ing] in a very serious limitation."

19

applications for DIB and SSI. Among other things, the claimant
argued that the ALJ erred at step three of the sequential
evaluation process by failing to find that she was per se
disabled. As in this case, the ALJ's step three analysis in
Jones was brief. The ALJ merely stated that after "carefully
compar[ing] the claimant's signs, symptoms, and laboratory
findings with the criteria specified in all of the Listings of
Impairments, the claimant's impairments do not meet or equal the
criteria established for an impairment shown in the Listings."
Despite the brevity of the ALJ's step three analysis, the Third
Circuit affirmed his step three determination, stating in
relevant part:

                         *    *    *

    To be sure, in Burnett v. Commissioner of Social Security
Administration we required "the ALJ to set forth the reasons
for his decision," and held that the ALJ's bare conclusory
statement that an impairment did not match, or is not
equivalent to, a listed impairment was insufficient.  220
F.3d 112, 119-20 (3d Cir.2000).  Here, Jones does not
specifically challenge the ALJ's ruling on the grounds that
it fails the Burnett standard.  Rather, Jones's only
reference to Burnett appears in a long list of citations in
support of the general proposition that "the ALJ must
analyze *all the evidence in the record* and provide an
adequate explanation for disregarding evidence."  (Appellant
Br. at 9)(emphasis in original).  In any event, the ALJ's
step three analysis in this case satisfies Burnett.  Burnett
does not require the ALJ to use particular language or
adhere to a particular format in conducting his analysis.
Rather, the function of Burnett is to ensure that there is
sufficient development of the record and explanation of
findings to permit meaningful review.  *See id.* at 120.  In
this case, the ALJ's decision, read as a whole, illustrates
that the ALJ considered the appropriate factors in reaching
the conclusion that Jones did not meet the requirements for

                            20

any listing, including Listing 3.02(a). The ALJ's opinion
discusses the evidence pertaining to chronic obstructive and
restrictive lung disease, specifically referencing
"[p]ulmonary function studies ... consistent with moderately
severe obstructive and restrictive defects," but pointing to
the lack of pulmonary complications, and a finding that
claimant's lungs were clear. Also, the ALJ noted that
claimant's medical history showed no frequent
hospitalization or emergency treatments. Tr. at 13-14.
(footnote omitted). This discussion satisfies Burnett's
requirement that there be sufficient explanation to provide
meaningful review of the step three determination.

\* \* \*

364 F.3d at 504-05.

Similarly, in the present case, the Court agrees with the

Commissioner that the ALJ provided "sufficient explanation to

provide meaningful review of the step three determination" with

respect to the issue of whether Plaintiff *meets* any listing

relating to skin disorders. Thus, the Court concludes that

Plaintiff's first argument is meritless.[22]

Turning to Plaintiff's second argument, although the ALJ

---

[22]In the brief filed in support of Plaintiff's motion for
summary judgment, counsel states: "The medical evidence certainly
shows that plaintiff has had recurrent skin rashes for many
years, no yet (sic) rashes which have persisted for at least
three months as required by the Listing." (Pl's Brief, p. 11).
Although not entirely clear, it appears that Plaintiff concedes
that she does not meet the requirements of Listing 8.05 because
the medical evidence does not show exacerbations of her eczema
persisting for at least three months. In any event, the Court's
careful review of the entire administrative record does not
reveal any evidence establishing an exacerbation of Plaintiff's
eczema persisting for a continuous period of at least three
months. Thus, the ALJ's determination that Plaintiff did not
*meet* any listing relating to skin disorders, including Listing
8.05, is supported by substantial evidence.

21

specifically discussed the medical evidence concerning exacerbations of Plaintiff's eczema, he never considered whether the evidence concerning recurrent exacerbations of Plaintiff's eczema was sufficient to show that Plaintiff's eczema is *equal to* the requirements of Listing 8.05. As to the frequency of flareups required *to equal* any skin disorder in Listing 8.00, including Listing 8.05, Section C2 of the introduction to the listing for skin disorders provides:

> 2. *Frequency of flareups.* If you have skin lesions, but they do not meet the requirements of any of the listings in this body system, you may still have an impairment that prevents you from doing any gainful activity when we consider your condition over time, especially if your flareups result in extensive skin lesions, as defined in C1 of this section. Therefore, if you have frequent flareups, we may find that your impairment(s) is medically equal to one of these listings even though you have some periods during which your condition is in remission. We will consider how frequent and serious your flareups are, how quickly they resolve, and how you function between flareups to determine whether you have been unable to do any gainful activity for a continuous period of at least 12 months or can be expected to be unable to do any gainful activity for a continuous period of at least 12 months....

Accordingly, to establish that her skin disorder is *equal to* the requirements of Listing 8.05, it is irrelevant that Plaintiff does not suffer from constant severe skin rashes from eczema. Rather, it is sufficient for Plaintiff to establish that the frequency of her eczema exacerbations would preclude gainful activity for a continuous period of at least 12 months, and the ALJ simply failed to acknowledge this alternative basis for a finding that Plaintiff is per se disabled. Thus, the Court

22

agrees with Plaintiff that the case must be remanded for further consideration.

With respect to remand, the Court is compelled to point out several errors and omissions in the ALJ's discussion of the medical evidence which need to be addressed by the ALJ. First, in discussing the exacerbation of Plaintiff's eczema in September 2004 when she presented to the ER of Jeannette District Memorial Hospital, the ALJ noted a statement in the hospital's records that Plaintiff "did not appear to be uncomfortable." (R. 20). It is not clear, however, whether this observation referred to the exacerbation of Plaintiff's eczema or to her jaw pain. In light of additional notations in the hospital's records, *i.e.*, that Plaintiff's chief complaint was a skin rash with lesions and tenderness and that Plaintiff was suffering from severe itchiness (R. 125, 127), it is likely that the statement noted by the ALJ referred to Plaintiff's jaw pain. Due to the apparent ambiguity of the statement, the ALJ erred in relying on it to support his determination regarding the severity of Plaintiff's eczema.[23]

---

[23]The Court also notes that several months later, in December 2004, Plaintiff underwent the consultative examination by Dr. Villegas who noted that Plaintiff had crusting lesions on both external ear canals and large hives over almost her entire face with dry, thick, scaly skin and oozing sores, and described his impression of Plaintiff's condition as "severe eczema." Although the ALJ acknowledged Dr. Villegas's findings regarding Plaintiff's physical examination (R. 20), he gives "lesser" weight to Dr. Villegas's report but erroneously fails to state his reasons for doing so. (R. 22).

Second, immediately after discussing the notation that "Plaintiff did not appear uncomfortable" at the ER in September 2004, the ALJ erroneously states that "[t]he following month, she underwent a basically normal physical examination. (Exhibit 2F)." (R. 21). A review of Exhibit 2F shows that the physical examination to which the ALJ was referring took place in November 2003, prior to the alleged onset date of disability in this case. Thus, the report is irrelevant.[24]

Third, the ALJ states that by April 2005, Plaintiff's eczema had cleared. (R. 21). Although an office note by Dr. Conforti dated April 21, 2005 does indicate that Plaintiff's eczema had cleared by the time of this office visit, the ALJ fails to mention an office note of Dr. Conforti dated April 1, 2005 which states that it is difficult for Plaintiff to work because she "needs her inhaler on a very regular basis and her eczema rash is difficult to control." (R. 166).

Fourth, the ALJ states that in April 2005, a physician noted that Plaintiff's eczema runs in cycles; that "her condition did not meet any listed impairment"; and that Plaintiff could engage in regular employment depending upon the type of work. (R. 21). The physician to whom the ALJ was referring is Dr. Baum.

_____

[24]With respect to the ALJ's reference to October 2004, a review of Exhibit 2F shows that the report of the November 2003 physical examination was sent to the Pennsylvania Bureau of Disability Determination by the Office of Vocational Rehabilitation in October 2004, as reflected on the cover letter.

However, contrary to the ALJ's statements, Dr. Baum began treating Plaintiff in December 2005, not April 2005, and her report was dated December 15, 2005. (R. 142). Moreover, Dr. Baum did not opine that Plaintiff's eczema did not meet a listed impairment. Rather, the questionnaire that Dr. Baum completed requested an opinion concerning whether Plaintiff's skin disorder met any listed impairment, and the questionnaire stated the Social Security Listings were enclosed with the questionnaire for Dr. Baum's review. Dr. Baum underlined the statement in the questionnaire that the Social Security Listings were enclosed, specifically writing under this statement that the Listings had not been enclosed ("none enclosed"). (R. 142). Clearly, the ALJ misread the report of Dr. Baum in this regard. Finally, Dr. Baum did not state that Plaintiff could engage in regular work depending upon the type of work. She said that Plaintiff could "possibly" work depending on the type of work, noting at the same time that a generalization was "too" difficult because there is no cure for eczema which runs in cycles - "It can clear and then flare up dramatically." In this connection, the Court also notes that the ALJ totally failed to address the issue of Plaintiff's cushionoid complication which is referred to by Dr. Baum in her report. (R. 142).

Fifth, in support of his adverse decision, the ALJ notes that "two doctors have indicated that the claimant's eczema runs

25

in cycles," and, therefore, the medical evidence does not support a finding of continuous severity of this condition. (R. 21-22). As noted previously, in order to establish that the severity of her eczema is *equal to* Listing 8.05, Plaintiff is not required to show that she suffers from severe skin rashes as a result of her eczema on a continuous basis. It is sufficient if the medical evidence establishes that Plaintiff is unable to do any gainful activity for a continuous period of 12 months due to frequent exacerbations of her eczema. Thus, the ALJ applied an erroneous standard with respect to the required frequency of flareups to establish that a skin disorder is *equal to* a listing in Listing 8.00.

Finally, the record was held open after the hearing to give Plaintiff's counsel the opportunity to submit the recent treatment records of Dr. Conforti, which he did submit prior to the ALJ's decision. (R. 158-71). Although the ALJ refers in his decision to the progress notes of Dr. Conforti which were submitted after the hearing (R. 167-71), he fails to address the report of Dr. Conforti which was submitted by counsel with the progress notes. (R. 158-65). In that report, which was completed in January 2006, Dr. Conforti notes, *inter alia*, that Plaintiff's eczema is a chronic condition which is difficult to control; that Plaintiff's progress has been poor due to "more frequent episodes of rash plus shortness of breath;" that

26

Plaintiff's employment opportunities are limited by continued exacerbations of Plaintiff's eczema with painful rashes, open sores and limitations in the range of motion of numerous body parts; and that plaintiff has a permanent disability. In light of Plaintiff's long treatment history with Dr. Conforti, the ALJ erred by failing to address this report and he should do so on remand.

William L. Standish
United States District Judge

Date: December 14, 2007

27